My name is Jeffrey Angel. I am an attorney from Bozeman, Montana, and I represent Burton Pretty On Top. Mr. Pretty On Top is a religious leader of the Crow Nation, and he had occasion to work for First Interstate Bank. He was hired as a management trainee. His job for 15 months was to learn that position. He complained during that time to the vice president of human, or about the vice president of human resources, because he thought that he and others in the bank were being discriminatory. And then at 10 months, two-thirds of the way through the program, he was fired. And the alleged and only reason the bank could provide is that his work wasn't good enough, with no examples. As the case proceeded to trial, the bank found, in hindsight, through nitpicking, a total of eight specific instances where they thought his work wasn't perfect. All of those instances were discussed during the discharging official's deposition, and he acknowledged that none of them were known to him at the time he discharged Mr. Pretty On Top. So what the jury heard was that Mr. Pretty On Top wasn't good enough two-thirds of the way through this training program, and then through long hours of depositions and, or testimony and many witnesses, we heard the factual underpinnings of example after example after example of details of less-than-perfect work that the bank knew nothing about. And the problem with that is this jury was not queried on whether motivation or retaliation played a part in the discharge, but it did get to hear details, in hindsight, that would make anyone think that this employee's not a good employee. You can take the best employee with a perfect record, and it's important to focus on Mr. Pretty On Top's record. He, as he went through each step of the training program, he got good reviews. So, as his employee file would have it— Well, you have three points on appeal. One is that they admitted after acquired evidence and based the decision on that. Two, that they improperly excluded an EEO-1 report. And three, that the jury instruction and verdict form was improper. Correct. So, why don't you address any of those three that you think is likely to succeed? These eight elements of after acquired evidence weren't excluded. They weren't— Were they objected to at the time? Yes. They were objected to through a written motion before trial, and they were objected to at the time of trial as each element was brought up. And there was voir dire of Mr. Rodriguez, the discriminating official, before he was allowed to tell the details. And he would acknowledge that, no, he did not know about the incidents we're about to talk about. So the— And as a proportion of all of the poor performance that was discussed at trial, what proportion of the poor performance testimony was comprised by these eight incidents? All of the testimony was after acquired evidence. The only thing Mr. Rodriguez could provide in his deposition after the bank's detailed search of his records was that his work wasn't good enough, without example. That's all the jury heard? All the jury heard was after acquired evidence and a comment that his work wasn't good enough. Wasn't he transferred a time or two during that training period because of problems in the— that were maybe not known to Mr. Rodriguez, but they were known to his supervisor? The only transfer Mr. Priddy on top received was after complaining to the CEO, Mr. Tom Scott, about the discrimination coming from the Vice President of Human Resources. So he complained about the Human Resources head discriminating against him, and then he received a transfer to Julie Scott, the CEO's daughter. And Julie Scott and her right-hand woman in this case communicated with Mr. Rodriguez, the Vice President's subordinate, and there's an email. And all it says is, we haven't found anything yet. It actually— I thought that at the six-month review, a whole laundry list of problems were discussed with your client at the time of his six-month review. The six-month review resulted in an extension of the probationary period, which he completed. But those—the reason for the extension was for performance issues, which were discussed with him at the time. I guess that's my question to you. Isn't that—isn't that so? That was after his complaint, there was performance issues discussed with him. That has to do with nexus, whether the reason for it, that in fact he was told at the time. It's not all—I guess I'm struggling with your statement earlier that the only thing the jury ever heard was stuff they figured out after he was let go. But I thought they also heard about all the things that led up to having an extension of his probationary period. They did hear that he had a six-month review and that his probation was extended, but there weren't any specific instances of misconduct to support that. What about the memo from Weigert, the assistant branch manager to Rodriguez, that even after the one month of special training, he would routinely ask questions about things that had been extensively covered. He did not know how to gear up when four customers were sitting there waiting and seeing customers refuse to go to him because of his performance and that it put a burden on the other employees. All of that was communicated to Rodriguez by Weidrich. Correct. And the concern that I had before trial in making the motion in limine to exclude the after-acquired evidence, how does the jury distinguish that in their mind from the majority of the evidence, which was the kinds of things like personality conflicts that happen on a day-to-day basis but are unknown to management and form no part of management's decision. The jury had no way of differentiating the laundry list of what is considered bad conduct through hindsight with the day-to-day attitude of the bank towards Mr. Pretty on Top. Again, he had, I think it was five performance evaluations, and every one of them was good as he completed the stage of the training. And at least most, if not all of them, also pointed out difficulties that he was having. For example, the speed of completing transactions and knowing the services that were supposed to be offered to customers and so on and so forth. Weren't those also in the performance reviews? The performance reviews were not only positive in that they didn't just say perfect employee. They would say good employee but needs to focus on. And I think that's what you would see out of a positive evaluation. Well, you also might see a negative evaluation where people are trying to motivate someone by saying, well, you know, you're making a great effort, but here are the things you need to do to get better. And I think the jury could have focused on exactly what the court's focusing on and considered whether this was really that kind of an evaluation where you terminate somebody or whether it was the other information that they learned afterwards. And they're doing this just to cover up the fact that he was reassigned for complaining about discrimination. But the jury was asked that question. Let me go back to one other question that Graber asked you. She asked whether any objections had been made, and you said, yes, you had made objections pre-trial. Well, at that pre-trial motion hearing, the district judge or the magistrate judge denied the motion and said your general legal principle was correct, but he'd have to apply it when this was fleshed out. Now, then the question was, did you then make motion at trial when this evidence was introduced? Did you specifically object to the evidence at the time of trial? Yes. Each one of the eight things, and went further. After the first few motions were denied at trial, I would then request a voir dire, and I would get the witness to say that he did not know about this at the time of his decision, and the evidence was still admitted. I see I only have 30 seconds left. Well, I'll give you some time for rebuttal. For rebuttal. Thank you, Your Honor. Please. If it pleases the Court, Steve Lehman, Your Honor, from Crowley Law Firm in Billington, Montana. I was the attorney who tried this case for First Interstate Bank. Basically, we have just untrue statements made in the opening argument. There was a mountain of evidence presented that had nothing to do with after-acquired issues. That was presented to Mr. Purdy on top. That was presented to the jury. This was a case that initially was investigated by the Montana Human Rights Commission, 15 single spaces of investigation. How many items, if any, do you believe fell into the category after-acquired evidence? Well, in my view, there were none, but there were potentially two that could be argued that he actually objected to, and the judge sustained his objection and kept the two exhibits out. When the matters of the exhibits was discussed with Burton Purdy on top in questions about did you do this with this particular customer, basically not dotting the i's and crossing the t's and messing up the customer's transaction, no objections. The evidence comes in. Even though he'd been invited in limine to object, he didn't object. I asked Mr. Rodriguez or the others, no objections. When we tried to put the exhibit in, two of the exhibits dealt with incidents that had happened right before his discharge that came to light within a week after he was discharged, the final transaction came to light that there had been a mistake. When the witnesses were asked, they said, well, it didn't have all of that in front of me. The judge sustained his objections and kept those two exhibits out, Exhibit 34 and Exhibit 35. They dealt with a person who was getting a credit card on her husband's account, a wife, but no permission from her husband, and a lady and a man who tried to change their account, wanted their Social Security put into their new account. He told them they didn't have to do that. He didn't close the old account. Social Security didn't get in. They come in on October 5th after he's discharged on September 28th. So what happened? We're getting our money from Social Security. Those two incidents were in documents that were completed October 2nd. Under one case, October 5th. When the other side objected to those two exhibits going in, the judge sustained. He said, I think that's after acquired. We're not going to go into that. When there had been questions earlier in the trial, even though invited to object on these issues, the plaintiff never objected. And there is nothing in the record. You can search the record. You'll see the discussions of these incidents. There's no objection. And so the judge can't possibly make a ruling when there's no objection in front of him. And so – What is your answer to my question about the proportion of the trial taken up by the things that are now being complained of as after acquired and the things that were known and discussed with – It would be 10% or less. I mean, these issues are not – And I can go through his eight issues that he says were after acquired. They weren't. An argument with another Native American. He got an argument in – I believe it was in July with another Native American about tribal politics in the bank, upsetting everyone. They gave him a warning. Said, you do this again, you're out of here. It's in writing. It's in the documents. It's in the file. It's not anything after acquired. It happened at the time. His second one is the error with the Social Security deposit. Again, it happened right before his discharge. It didn't totally come to light until the – within a week after he was let go. So that's the one the judge said, I'm not letting that exhibit in. The credit card. Same thing. Judge not letting this exhibit in. A long line on the curriculum today because two tellers were indisposed. He went to training that should normally take two weeks. They spent eight weeks with one person and another eight weeks with another person trying to train him on how to use the teller, how to be a teller. They gave him every opportunity to train, and this came out then in the testimony. Again, no objections to any of this. The people who were training him, explaining the difficulties that we have having to show him over and over again how to do these basic transactions, and he couldn't get it. The two trainers, coworkers, not management people, explaining to the jury we've spent all this time with him and he can't get it. He's not ready to be on his own. The manager who's over him testifying, I observed him. The trainers were there. He's not ready to be on his own. We couldn't put him into a teller position, which is what he was being trained for, to be a manager in a Walmart, which was retail services, including tellers. And the one witness testifies, I walk into Walmart one day. He happens to be there alone. The line is out to the door. I jump in and just, even though it's my off time, start helping out. No objection to that, but now he says that's after acquired evidence. Again, it's all consistent with the problems these people were having and why they were saying he's not ready. After training for 16 weeks as a teller, they put him into, they said, well, let's give a break from that. It's not getting anywhere. Let's put him into collections. So they put him in collections and try him there. He has all kinds of problems. They're all documented. He says these aren't, but complaints to coworkers about racism, private discussion with security personnel, about anger issues he had in his youth. He lists personal phone calls to the collection department, his outstanding loans. These all came up in the collection department. They were all documented. They're all in the file. Mr. Rodriguez, the supervisor who is involved in the ultimate decision, a minority himself, has all of this. This is not after acquired evidence. There's nothing that's after acquired. This is nothing like the O'Day case where the person was terminated on a layoff. And then in discovery, a year later, they find this guy had snuck in one night and rifled the boss's office and got this information. And now they're saying, well, we're turning this into a termination case. We determined him for that. This isn't that after acquired case at all. And, again, when the plaintiff did object, as the judge did throughout this case, the judge used his discretion in the plaintiff's favor time and time again throughout this case. It starts with the beginning of the case. The summary judgment was denied despite the Villamo decision versus Aloha that said, you know, in these cases where the evidence is overwhelming, there's no discrimination, summary judgment should be granted. The judge said, I see the basic paraphrasing the judge's summary judgment decision. I see the amount of evidence, but it's a motivation question and discrimination, so I'm going to let there be a jury trial. You know, they continue to give the plaintiff the break time and time again throughout the trial on all of these rulings, including the two where he says, okay, I'm not letting these two exhibits come in because they weren't finalized until about a week after the plaintiff was discharged. The court used his discretion time and time again to let the plaintiff make every argument he could. In the end, the court directed a verdict on the age discrimination case because there was no evidence that there would have been anyone replacing the plaintiff that was younger. There's no evidence of one of the basic facts, no appeal on that issue. The court did deny the EEO-1 document because at the last minute just before trial, the plaintiff says, well, I'm going to produce this document and that proves my case. There's only 1.6% Native Americans in the total workforce of the bank, and there's 3% in Yellowstone County where one of the branches of the bank is located. You know, if we object and say this is too late, you know, this is the type of evidence that would have to be put in through an expert, how many people have applied, how many qualified people have applied, there's no regression analysis, no analysis whatsoever, and the court agreed. Is there a transcript of that ruling? The plaintiff refused to get it. The plaintiff refused it, and we requested that the court order them to get the transcript. How can we even review it without a transcript? That's our point in our brief. It shouldn't be reviewed because the plaintiff did not get the transcript of that, nor did he get the transcript of the settling of the case. And what would the relevance be to a disparate treatment case to have just the bare numbers? There's none. We've pointed out to cases in life that there's no relevance to this whatsoever, to this kind of disparate treatment. It's an attempt, and the judge saw that and said, you know, this is for disparate impact kind of evidence. We're going to have a disparate impact case. We're not going there. And the judge, again, did not abuse his discretion. He made the only decision he could at that incident. On the instructions, the complaint the plaintiff's attorney is making is his own instruction. He's the one who, in the one paragraph in instruction three that he offered, has a mixed motive reference. You know, the discussion was, again, the plaintiff's attorney refused to get the transcript. It was discussed with the court, and at the end the court said, you know, this isn't a mixed motive case. We're not going to go into that. And the plaintiff agreed. I mean, there's nothing that happened here that was any abuse of discretion. The only thing that occurred is that the court gave the plaintiff every opportunity in a case that probably never should have been tried because there was such a mountain of overwhelming evidence, day after day, that he couldn't get it. You know, we put in the evidence, which was in front of everyone of this not afraid, this argument with the other tribal member. They didn't terminate him for that. They just warned him. They still wanted to make it work. They sent him out through a branch with Julie Scott and Donna Weedrick, who they hoped would have more time. Maybe they could get it going because they'd invested time in him. They wanted to see if this could work. But, again, he just couldn't get it. And they had incident after incident, customers avoiding him, customers having problems. They're finally telling him on September 19th, we can't let you be alone with customers anymore because you won't dot the i's and cross the t's. Okay, counsel, I think we've reached the end. Thank you, Your Honor. Thank you. I only have a moment. We'll give you two minutes. I want to save the court the time because it's not necessary to read the entire transcript, which would, when somebody says there was lots of evidence, you'd pretty much have to read the whole transcript to know if that's true. We have eight instances which the counsel and the jury heard by descriptions like the credit card or the Social Security transaction, the instance with Mr. Not Afraid. Eight different ones. I put in the brief every one of those and succinctly in the deposition asked the opponent once after another, did you know about this when you made the decision? No, no, no, no. All eight of them. There is no instance with any kind of a reference or details other than those eight. Counsel, let me ask you about the other two issues. How can we possibly review whether or not the district court's ruling was sensible or so far out of sensible that it's an abuse of discretion without the full transcript of the rulings? The rulings were done in writing. The bank made this argument about the transcript to the court asking under the rules when we said this is the portion of the transcript we're going to order. The district court made us brief the issues on appeal and then made a ruling about what portions of the transcript it believed were necessary. So you think we should simply look at the written materials and rule based on whether we think that the written materials demonstrate or don't demonstrate an abuse of discretion? Yes, the court ruled on the EEO-1 report. The court ruled in writing on the after acquired evidence. What's the relevance of an EEO-1 report to a disparate treatment claim where the allegation is that an individual has animus towards another individual? What's the relevance? The bank claims it's a disparate impact case. We've always maintained that it's not that. The bank just doesn't hire Native Americans. But he was hired. I don't understand that. I thought your claim was that there were individuals who were prejudiced against him and in particular because he had complained there was retaliation against him individually. He wasn't hired through the normal channels. It was a fluke that he got hired and the records of who they employ, the bank, the 1,585 employees, it shows that they don't have a practice to hire Native Americans. He happened to have an occasion to meet with the CEO, and the CEO overstepped his bounds and offered him a job. And then he was under the guise of Richard Rodriguez and Bob Jones. And those two people that do the hiring normally are the ones that were discriminating against him. And they acknowledge, especially Bob Jones' comment, that it was not what you would expect of an HR person. It might be considered discrimination if it continued. The question is, the eight out of ten marks that he got on those reviews, do they really support the bank's story, or did they bring up all of these other eight instances, the only ones they were able to find in his ten months there, eight specific instances to try to cover up the retaliation? We won't know because the jury only was asked, did they discriminate or retaliate? And they should have been asked, did they, if you think they fired him for legitimate reasons, was discrimination and retaliation also a motivating factor? Thank you. Thank you, counsel. Case different argument will be submitted. Court will stand in recess for the morning.
judges: Goodwin, Reinhardt, Graber